Filed 2/15/24  In re I.T. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re I.T., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D082441 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. J520755) |
| T.M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

T.M. (Mother) appeals from the juvenile court's order terminating her parental rights as to her four-year-old son I.T. (the child) following a

contested Welfare and Institutions Code[1] section 366.26 hearing. She maintains the juvenile court erred by not applying the parental benefit exception in lieu of ordering a permanent plan of adoption. We affirm the juvenile court's order.

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. *Referral and investigation*

According to the San Diego County Health and Human Services (Agency) June 2, 2022 detention report, the child abuse hotline received its first referral as to the child on May 10, 2021. After Mother was admitted to a hospital for treatment of an infection, she tested positive for methamphetamines, THC, opiates, and benzodiazepines, and while there, she admitted to using drugs daily and caring for her son while under the influence. Two days later, the hotline received another report. The caller similarly reported that Mother was under the influence while caring for the child and would leave him unsupervised while she used substances. The caller also raised concerns of gang affiliation, prostitution, and an unsecured gun in Mother's residence.

When interviewed, Mother told the social worker she began using methamphetamines at the age of 14 and had previously undergone treatment and experienced some periods of sobriety over the years. She had been the primary caregiver for her then two-year-old son and admitted to using marijuana in his presence, leaving him unsupervised in another room while smoking methamphetamines with friends, and caring for him while under the influence. She drank three to four times per week, got drunk about once a week, and for the three months prior to her hospital admission, she used

_____

1     All further statutory references are to the Welfare and Institutions Code.

methamphetamines, THC, and Xanax daily.  Mother believed it was fine if she used while the child was in another room.

According to the detention report, in December of 2020, Mother sent the child to live with the maternal grandparents while she continued to use on and off.  She had no long-term sobriety since then but stated she did not need treatment.  According to maternal grandfather, Mother left the child with maternal grandparents in California for six weeks while she went to Iowa.

The Agency's investigation was substantiated for general neglect, and a safety plan was created on May 18, 2021, whereby Mother agreed to have the maternal grandparents be the sole caregivers for the child with supervised visitation.

B. *Section 300 petition and jurisdiction/disposition hearing*

On June 1, 2021, the Agency filed a petition pursuant to section 300 and a protective order was issued.  The following day, the juvenile court approved the child's detention in the maternal grandparents' home and set a jurisdiction and disposition hearing.  The maternal grandparents had cared for the child full time since Mother was admitted to the hospital on May 5, 2021, and they continued to care for him throughout this dependency case.

In its July 22, 2021 jurisdiction/disposition report, the Agency reported that Mother admitted to driving the child after consuming a marijuana edible on Easter day in 2021, but she claimed she was not high.  She stated she was not using drugs at that time but confirmed drinking alcohol and abusing Xanax.  She was attending outpatient treatment at McAlister North Central Women's Recovery Center (McAlister), and although she was struggling with anxiety, she was not receiving any mental health treatment.  The Agency was concerned that the minor was at significant risk of harm and recommended

3

that the parents receive family reunification services and the child remain in out of home care.

The jurisdiction and disposition hearing was held on September 29, 2021. The juvenile court removed the child, then age two, from the parents' custody pursuant to section 361, subdivision (c). The court ordered reunification services for both parents[2] and scheduled the six- and 12-month review hearings.

On January 18, 2022, Mother was arrested for vehicle theft, possession of a controlled substance and paraphernalia, possession of stolen property, forgery, and possession of burglary tools. The criminal court was apparently willing to vacate the charges upon Mother's completion of the KIVA residential substance abuse treatment program. Although Mother enrolled in the program, she did not stay sober and left the program on March 2, 2022.

Mother reentered the KIVA program on March 15, 2022, and expressed a willingness to commit to treatment. The Agency commended Mother for returning to treatment and focusing on learning tools to remain sober. In addition, Mother had begun to gain insight into how her behaviors had been unsafe for her child and was open to therapy and following the recommendations of the Agency. As a result of Mother's progress, the Agency recommended an additional six months of reunification services.

C. *Six- and 12-month review hearings*

At the six-month review hearing on April 28, 2022, the court terminated reunification services for the father. Although it found that returning the child to the custody of Mother would create a substantial risk of detriment to the child's physical or emotional well-being, the court adopted

---

2     Father was incarcerated when I.T. was removed from his Mother's custody and was again incarcerated at the time of the section 366.26 hearing. He does not contest the order terminating his parental rights.

4

the Agency's recommendation to extend reunification services for six months and permitted unsupervised visits with Mother while she was at the KIVA residential program.

Mother completed the KIVA program on June 2, 2022 and consistently visited the child while there. However, after completing the program, she was unable to maintain her sobriety, and although she had the opportunity for supervised visitation, Mother only visited with the child on June 8, 2022, and then stopped visiting "due to her continued substance use and instability." Mother would request video visits with the caregiver but would not call for the actual visit.

In its July 28, 2022 report, the Agency reported that Mother was incarcerated. On July 11, 2022, she was arrested on a warrant when she went to visit a friend at the George Baily Detention Facility. She was charged with multiple felony counts including burglary, vehicle theft, possession of stolen vehicle and using another's ID along with five misdemeanor counts including intent to defraud, receiving stolen property, and possession of a controlled substance and paraphernalia. According to the Agency, Mother had not demonstrated that she understood how her unsafe behaviors impacted the child, and the Agency noted that she went to visit a friend in prison but had not visited her own child. The Agency recommended termination of reunification services and the scheduling of a section 366.26 hearing.

On August 17, 2022, Mother was released from jail and moved to a sober living facility. Mother began visiting the child weekly, and on September 14, 2022, she had an intake appointment at McAlister to again begin substance abuse treatment. The Agency commended Mother for getting back into treatment but noted that she had not displayed the ability

to maintain her sobriety despite completing an inpatient treatment program, participating in multiple outpatient programs, and living in various sober living facilities. She continued to associate with people who hindered her ability to maintain her sobriety and avoid criminal activity, she did not use her coping skills or commit to the lifestyle changes necessary to remain successful with reunification, and she continued to believe that using substances while parenting was safe.

The child, on the other hand, was reported to be in a loving and nurturing environment and had bonded to his maternal grandparents, who had committed to his long-term care. The Agency reiterated its recommendation that the court terminate reunification services and set a section 366.26 permanency hearing. The 12-month review hearing was held on September 29, 2022. The court terminated reunification services, ordered supervised visitation, and set a section 366.26 hearing for January 26, 2023.

D. *Visitation following failed reunification efforts*

In its section 366.26 report, the Agency reported that, according to the caregiver, Mother visited with the child "with some consisten[cy] but has missed visits or canceled using numerous reasons." In its April 25, 2023 addendum report, the Agency reported that Mother and the caregiver had verbal altercations in front of the child, and the caregiver spoke negatively about Mother in front of the child. Mother and the caregiver agreed to behavior support. The Agency submitted a referral for formal supervised visitation at a family visitation center and scheduled weekly virtual visits.

The Agency acknowledged that Mother had been consistent with visits over a few months but noted that she had not attended visits consistently throughout the case and did not stay in contact with the caregivers or the Agency to get updates about the child for long periods. Between May 20,

6

2021 and March 14, 2022, Mother was inconsistent in attending in-person and virtual visits. At one point, she missed all the scheduled visits in one month and stopped seeing the child entirely.

Mother reported many reasons why she could not attend visits and missed multiple visits including moving frequently, being incarcerated, and starting and stopping treatment for substance abuse. The instability in Mother's life made it difficult to schedule visits. The Agency referred Mother to the family visitation center for supervised visitation multiple times, but all the referrals were closed due to her cancellations, no-shows, or failures to respond to requests to set up services.

Between March 15, 2022 and June 8, 2022, Mother visited the child with regularity while she was in treatment at KIVA, but then relapsed. Between June 10, 2022 and August 17, 2022, she tested positive for methamphetamines and fentanyl and was asked to leave her sober living for five days. She did not return. Shortly after relapsing, Mother was arrested and detained at Las Colinas Detention and Rehabilitation Facility until August 17, 2022. After her release, she began residing in sober living, stayed clean, and became employed. During that time, the caregiver stated that Mother would request video visits with the child but would not call for the actual visit and that she did not visit with the child for over two months.

Between January 10, 2023 and April 14, 2023, the Agency supervised nine in-person visits and the caregivers provided weekly virtual visits. During this three-month period, the visits went well. Mother was on time, did not cancel, and engaged positively and appropriately with the child, giving him positive attention and affection. The child looked forward to the visits, was happy and excited to see Mother, and became upset or cried when the visits ended.

In its assessment of the parent-child relationship in its April 25, 2023 report, the Agency stated that Mother had not maintained regular and consistent contact with the child, and that it was only in recent months that Mother had consistent and regular contact. The child did have a substantial, positive, emotional attachment to Mother as evidenced by his reactions to her during their visits. However, the Agency found it questionable that termination of parental rights would be detrimental to him since he had no issues when he spent days at a time without seeing Mother. The child was thriving in the care of his grandparents, where he had been placed for the past almost 24 months (nearly half his life). In addition, when the social worker asked the child who he would want to live with if he could live with anyone, he replied, "My grandpa."

Although Mother and the child had a positive relationship, the Agency concluded it did not supersede the benefits of adoption, which was in the child's best interests. The Agency believed the child deserved to live in a safe, stable, healthy, and loving environment free of drugs and violence and recommended termination of parental rights and a permanent plan of adoption. His grandparents were able and willing to adopt him and could provide him with permanence, stability, and safety while maintaining family connections. If parental rights were terminated, the Agency noted that visitation would be at the caregiver's discretion and recommended that visits continue to be supervised.

The Agency submitted two addendum reports prior to the section 366.26 hearing focused on Mother's visitation. According to the May 24, 2023 addendum report, Mother did not attend her scheduled in-person supervised visits on April 28, 2023 and May 5, 2023. She stated she did not feel well on April 28, and although she contacted the caregiver on May 5, 2023 to inform

8

him that she could not attend, she did not contact the social worker.  She was late for her next scheduled visit on May 12, 2023, which had been rescheduled with Mother's agreement to begin at 4:30 p.m.  Mother did not arrive until 5:06 p.m., and the visit was scheduled to end at 5:30 p.m.  After announcing several times that the visit was over, the monitor left at 5:45 p.m.  The caregiver later reported that after the monitor left, Mother refused to separate from the child, resulting in the child crying while the caregiver picked him up and walked toward the building.  Mother continued to follow the caregiver, begging him for more time with the child.

Mother was considered a "no show" for her next supervised visit on May 14, 2023.  She claimed someone's car broke down and requested a FaceTime visit instead.  The caregiver initially refused but then agreed to a brief visit.  The child did not appear happy to see Mother and appeared sad during the visit.  The caregiver also reported that Mother had moved out of her sober living and into an apartment complex with some of her old friends, and he was concerned for her safety and sobriety.  The Agency maintained its recommendation for termination of parental rights and adoption.

In its May 31, 2023 addendum report, the Agency reported that Mother attended the May 19, 2023 visit, and she and the child played together and walked to a nearby deli to get something to eat.  When the caregiver arrived toward the end of the visit, the child wanted to leave but agreed to stay for the five remaining minutes at Mother's request.  Mother was a "no show" for her May 21, 2023 visit and did not give notice that she was not going to make it.  Mother attended the May 26, 2023 visit, and she and the child played, talked, laughed, and had a snack.

E. *Section 366.26 hearing*

At the pretrial status conference on May 24, 2023, minor's counsel informed the court that the child "wanted the court to know he enjoys visits with his mother [and] would like to continue seeing her." Minor's counsel, as the child's guardian ad litem, planned on submitting on the Agency's recommendations of termination of parental rights and adoption, but stated it would check in with the child again "given his young age to the extent he understands" as he appeared hesitant about the recommendation of adoption because he wanted to continue visiting with his mother.

The contested section 366.26 hearing was held on May 31, 2023. The trial court admitted the Agency's reports dated January 26, April 25, May 24, and May 31, 2023 without objection. Mother objected to the termination of her parental rights and requested a lesser plan of guardianship. She did not present any affirmative testimony or other evidence, but her counsel argued: "When [M]other does have visitation, she has very positive visitation. The [Agency] report indicates that there are times when the minor appears to be sad at the end of the visit. They always have a very good time. The minor is happy to see the [M]other. When [M]other does have visitation, they are consistent. There were multiple times when the minor was observed to be excited to see [M]other and was unhappy he couldn't leave with her."

Minor's counsel submitted on the Agency's recommendations. She noted the child felt "safe and protected" with the caregivers, and asked the court to find by clear and convincing evidence that the child was both generally and specifically adoptable, his caregivers were willing and capable of adoption, and the parents did not meet their burden to show the parental-benefit exception.

10

The Agency joined in minor's counsel's argument and also argued that neither parent established an applicable exception. Counsel acknowledged that there have been periods of time when Mother attended visitation "somewhat consistently," but when looking at the entirety of the case, Mother had been inconsistent, even since the last hearing. Although the child had a relationship with his mother, the Agency argued "it would not be detrimental for him to have that relationship severed given the stability that he gets through his current placement," and his caregivers have "remained committed to maintaining him in their home for in excess of almost two years now."

The juvenile court found the child was adoptable and that it was in his best interests to be adopted. The court also determined that the parental-benefit exception did not apply and terminated parental rights.

Mother filed a timely appeal.

## DISCUSSION

### A. *General principles*

After reunification services have been terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interests of the child, including the child's interest in a "placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) At the section 366.26 hearing, the juvenile court has three options: terminate parental rights and order adoption; appoint a legal guardian for the dependent child; or order the child be placed in long term foster care. (§ 366.26, subd. (b).) "Adoption is the preferred permanent placement, and, in the absence of an enumerated statutory exception, the juvenile court is required to select adoption." (*In re Fernando M.* (2006) 138 Cal.App.4th 529,

11

534 citing *In re Jasmine T.* (1999) 73 Cal.App.4th 209, 212.) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53, original italics.)

The burden to show that termination of parental rights would be detrimental to the child under one of the exceptions rests with the parent. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) In this case, Mother asserted the parental-benefit exception, which required her to establish the following three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 636–637 (*Caden C.*), original italics.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632, original italics, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

B. *Hybrid standard of review*

The first two elements—whether Mother had regular visitation and contact and a relationship with the child whose continuation would benefit the child—are essentially factual determinations that are subject to the substantial evidence standard of review on appeal. (*Caden C., supra,* 11 Cal.5th at pp. 639–640.) The third element and ultimate decision— whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and is therefore subject to an abuse of discretion standard of review. (*Id.* at p. 640.) When assessing the application of the parental-benefit exception under this hybrid

12

standard of review, "there likely will be no practical difference in application of the two standards" as we evaluate the factual basis for the juvenile court's exercise of discretion. (*Id*. at p. 641.)

The appellate court will not " 'substitute its own judgment as to what is in the child's best interests for the trial court's determination . . . . [Citation.]' " (*Caden C*., *supra*, 11 Cal.5th at p. 641.) The juvenile court's determinations will be upheld if supported by substantial evidence, " 'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence. [Citations.]' " (*Id*. at p. 640.)

The juvenile court's ultimate determination of whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent will only be reversed for an abuse of discretion when " ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Caden C*., *supra*, 11 Cal.5th at p. 641; see also *In re Robert L*. (1993) 21 Cal.App.4th 1057, 1067 ["The reviewing court should interfere only ' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did" ' "].)

In this case, the juvenile court stated "none of the circumstances listed in section 366.26 subdivision (c)(1) . . . exists in this case that would make termination of parental rights detrimental to this child." It did not make any specific factual findings as to its conclusion that the parent-benefit exception did not apply in this case, and there is no requirement that it do so. (See *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156 [there is "no requirement . . . that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of

13

the three elements of the exception."].) We affirm the juvenile court and address its implied findings as to the application of the exception in this case. (See *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [implied finding by juvenile court that parents had failed to establish the parental benefit exception].)

C. *First element—regular visitation and contact*

The juvenile court determined that the parental-benefit exception did not apply but did not make any express findings as to each element. Thus, on appeal, we "draw all appropriate inferences in favor of the judgment below." (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [we consider the evidence "in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolv[e] all conflicts in support of the order."].)

Substantial evidence supports the juvenile court's implied finding that that Mother had not maintained regular and consistent visitation with the child. Mother did not present any affirmative evidence, and the Agency's reports reveal that Mother's visitation was inconsistent and sporadic during the 24 months the child was in the care of his maternal grandparents.

The Agency's April 25, 2023 addendum report unequivocally stated that Mother "ha[d] not maintained regular and consistent contact with [the child]." More specifically, Mother's visitation was inconsistent between May 20, 2021 and March 14, 2022, and during that time, she missed all scheduled visits in one month and stopped seeing the child entirely. All of Mother's referrals to the family visitation center during this time were closed as a result of Mother's failure to respond, cancellations, or no-shows.

14

Although Mother visited the child regularly for almost three months between March 15, 2022 and June 8, 2022 while enrolled in the KIVA residential treatment program, she relapsed shortly thereafter and was arrested and detained in jail until August 17, 2022. Although she would request video visits during that time, she would not call for the actual video visit and therefore did not visit with the child for over two months.

During the three-month period between January 10, 2023 and April 14, 2023, Mother's visits were again regular. However, in the weeks before the section 366.26 hearing, Mother's visits were once again inconsistent. Mother did not attend her scheduled in-person supervised visits on April 28, 2023 and May 5, 2023, was late to her May 12, 2023 visit, and was considered a "no show" for her May 14, 2023 supervised in-person visit.

Substantial evidence supports the juvenile court's implied finding that Mother failed to prove regular visitation and contact with the child. The dependency proceedings in this matter spanned over two years and there were at least two extended periods where Mother fell out of contact and failed to visit entirely. Her inconsistent record of visitation cannot support application of the parental benefit exception. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 531 [regular visitation not present when there were significant lapses in visitation]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212; *In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption."].)

   D. *Second element—the child would benefit from continuing the relationship with Mother*

As for the second element, Mother must prove, by a preponderance of the evidence, that the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B); *Caden C., supra,* 11 Cal.5th at p. 632.)

15

The Agency stated in its April 25, 2023 addendum report that "[the child] ha[d] a substantial, positive, emotional attachment to [Mother] as evidenced by [his] reactions to his mother during their visits," but noted that he "thrives in the care of his grandparents and spends several days without seeing his mother without issue." The Agency went on to conclude that "although [Mother] and [the child] have a positive relationship, it does not supersede the benefits of adoption."

The subsequent Agency reports summarizing Mother's visitation during the weeks immediately preceding the contested permanency planning hearing reveal that Mother's visits were again inconsistent (she missed four of the seven scheduled visits), and the child was not always happy to see Mother nor was he sad when visitation ended, and Mother's behavior at one of the visits was apparently disruptive to the child's emotional well-being. After cancelling two consecutive visits, Mother was over 35 minutes late to the May 12, 2023 visitation. She remained an additional 15 minutes after the visit had ended despite the visitation monitor repeatedly informing her that the visit was over. After the monitor left, Mother refused to separate from the child, who began to cry. After the caregiver had picked up the crying child, Mother followed him to the building, begging him for more time with the child.

Mother was considered a "no show" for the next in-person visitation on May 14, 2023, but the caregiver agreed to a brief FaceTime visit. The child "did not appear happy to see his mother and appeared somewhat sad." On May 19, 2023, the child wanted to leave the in-person visit a few minutes early after he saw his caregiver arrive. Mother was again a "no show" for her next scheduled in-person visit on May 21, 2023, and although Mother

16

appeared for the last reported visitation on May 26, 2023, there was no mention of the child being sad at the end of that visit.

Mother did not present any affirmative evidence or testimony. Her counsel merely argued that "[w]hen mother *does* have visitation," it is positive and they "have a good time," and "[t]here were multiple times when the minor was observed to be excited to see mother and was unhappy he couldn't leave with her." (Italics added.)

"Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Evidence that the child had a substantial, positive, emotional attachment to Mother and playful and positive visitations does not necessarily prove the child would benefit from *continuing* the relationship." (§ 366.26, subd. (c)(1)(B)(i), italics added.) "[T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

At the time of the section 366.26 hearing, the child had been in the continuous care of his maternal grandparents for 24 months from age two to four (half his life).[3] His experience of day-to-day interaction, companionship and shared experiences were with his grandparents. He was thriving in their care while experiencing sporadic and inconsistent visits with Mother. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 ["The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.]

---

[3] In addition, in 2020, prior to the filing of the dependency petition, Mother left the child with the grandparents for six weeks while she went out of state.

The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.]"].) Mother must show more than "loving contact, an emotional bond with the child, or pleasant visits." (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229; see also *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].)

The juvenile court could reasonably conclude, after considering all the facts and circumstances in this case, that Mother has failed to establish that the *child* would benefit from *continuing* the relationship with her. Examining the evidence in the light most favorable to the judgment, we conclude that substantial evidence supports the trial court's finding that Mother failed to meet her burden to establish the second element. Even if, arguendo, Mother was able to prove the second element, in order for the parent-benefit exception to apply, Mother was required to show, by a preponderance of the evidence, *both* of the first two elements—that she had "maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i), italics added.)

E. *Third element—the benefits of adoption outweigh any detriment caused by termination*

Although Mother's failure to satisfy the first or the second element serves to prevent the application of the statutory parent-benefit exception, we nonetheless address the third element and conclude the juvenile court did not abuse its discretion by finding that the benefits offered by adoption outweighed any detriment caused by terminating Mother's parental rights. (See *In re M.G.* (2022) 80 Cal.App.5th 836, 852.)

18

"If severing the natural parent/child relationship would deprive a child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) But "[w]hen the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.) We are mindful that such a relationship can involve "tangled benefits and burdens," requiring the court to engage in "the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

Mother suggests the court lacked sufficient evidence to conclude the parent-benefit exception did not apply because it did not question the child or consider a bonding study. Mother ultimately bore the burden to establish the exception applied (see *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345 (*Lorenzo C.*)), and she did not attempt to call the child as a witness (see *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1085) or request a bonding study. (See *Lorenzo C.*, at p. 1339 ["There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order."].) " ' "We must indulge in every presumption to uphold a judgment, and it is [Mother's] burden on appeal to affirmatively demonstrate error—it will not be presumed. [Citation.]" [Citations.]" ' " (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1161.) Mother has not demonstrated any error.

Mother's reliance on *In re D.M.* (2021) 71 Cal.App.5th 261 is similarly unavailing. In that case, the Department's reports gave the court little evidence about the quality of the visits or how the children felt about the

father.  (*Id*. at p. 271.)  Here, in contrast, the Agency's reports in this case provided a detailed account of the child's visits with Mother and made clear how the child felt about her.

Severing the child's relationship with Mother in this case does not outweigh the benefits he would gain from the stability and security an adoptive home offers.  The child is thriving in maternal grandparents' home where he has lived for over two years and where he has expressed a desire to live.  We cannot conclude that preservation of the parent's rights should prevail over the Legislature's preference for adoptive placement.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349, disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)  The  juvenile court did not abuse its discretion when terminating Mother's parental rights.

## DISPOSITION

The juvenile court's May 31, 2023 order is affirmed.


KELETY, J.


WE CONCUR:



DATO, Acting P. J.



DO, J.

20